IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

```
                             )
JASON MANN,                  )
                             )
        Plaintiff,           )
                             )
           v.                )        1:08cv611 (JCC)
                             )
HECKLER & KOCH DEFENSE, INC. )
et al.,                      )
                             )
        Defendants.          )
```

## **M E M O R A N D U M   O P I N I O N**

This matter is before the Court on Defendants Heckler &
Koch Defense, Inc. (HKD) and Heckler & Koch GmbH's (HKGmbH)
(collectively, Defendants') Motion for Summary Judgment.[1]  For
the reasons below, the Court will grant the motion for summary
judgment.

### I. Background

The undisputed facts are as follows.  HKD is a Virginia
corporation specializing in the sale of firearms and related
equipment to the United States military and state and federal law
enforcement agencies.  Plaintiff Jason Mann (Mann) is an
individual domiciled in the Commonwealth of Virginia.  He was

---

[1] On May 5, 2009, the Court dismissed HKGmbH from this action with
prejudice in response to a stipulation of dismissal by Plaintiff and Defendant
HDK.

1

employed as HKD's Law Enforcement Sales Manager from April 2, 2007 until July 17, 2008.  Mann's direct supervisor was Wayne Weber (Weber).

On November 23, 2007, the United States Secret Service (Secret Service) published a Request for Proposals (RFP) to procure assault rifles equipped with ambidextrous selector levers (ambi-levers).  Ambi-levers are devices that allow the same rifle to be used by either a left-handed person or a right-handed person.  The RFP required interested parties to submit both a bid and sample rifles by February 29, 2008.  In response to the RFP, HKD decided to offer its model HK416 rifle, which was not equipped with ambi-levers.

On February 28, 2009, HKD submitted its bid and sample rifles without ambi-levers to the Secret Service.  HKD's written proposal stated that "HK416 ambidextrous selector level item is currently in production and available, however will not be available for the initial delivery date of the test weapons due to import timelines."  Def.'s Mot. for Summ. J., Sorensen Decl. at Ex. 7.  The parties dispute the veracity and significance of this statement.  Plaintiff was not aware of this statement until after he instituted this action.

Later in the day on which HKD submitted its bid, Weber received aftermarket ambi-levers from a consultant, Larry Vickers (Vickers).  The combination of the HKD rifle and the aftermarket

2

ambi-lever did not meet HKD's typical quality standards.  After the Secret Service's RPF had closed, Weber directed Robbie Reidsma (Reidsma), one of Mann's subordinates, to hand-deliver the aftermarket ambi-levers to Secret Service Officer Galvin.  On March 3, 2008, Reidsma gave them to Officer Galvin in a parking lot at night.[2]

On April 25, 2008, the Secret Service sent Reidsma a letter rejecting HKD's response to the RFP because the bid did not comply with the solicitation.  Def.'s Mot. for Summ. J., Sorensen Decl. at Ex. 13.  It also stated that "[n]o revised proposals will be considered under the subject solicitation." *Id.*  On May 21, 2008, the Secret Service sent HKD a letter saying that the entire subject solicitation would be canceled.

On March 10, 2008, before the Secret Service took either of these actions, Weber informed Mann about Reidsma's delivery of the ambi-levers to Officer Galvin.  Mann expressed disapproval of this action to both Weber and Reidsma.  Mann also shared his concerns with others.  John Aliveto (Aliveto), HKD's Director of Business Development, informed other HKD personnel, including Judy Cox (Cox), HKD's controller, and Roz Weaving (Weaving), HKD's Human Resources Manager, about Mann's assertions against Weber.  Weaving initiated her own informal investigation

---

[2] It is unclear what, if anything, Officer Galvin did with the aftermarket ambi-levers.

of Mann's allegations.  On April 8, 2008, Cox and Weaving notified Martin Newton (Newton), the President of HKD and CEO of HKGmbH, of Mann's allegations.  Newton directed Weber, Mann, Cox, Weaving, Aliveto, and Rob Tarter, HKD's Manager of Military Sales (Tarter), to stop their discussion and investigation of Mann's assertions until a proper inquiry could be completed.  HKD then conducted a formal investigation into Mann's allegations.

HKD placed Mann on paid administrative leave for approximately one week, beginning on April 9, 2008.  During that time, he was not allowed into HKD's office unescorted and his access to his HKD e-mail, phone, and files was cut off.  On April 14, 2008, Weber sent a four-paragraph e-mail to six HKD employees that included the statement: "You may or may not be aware of what occurred last week, but in the event that you are not, here is a brief update.  Jason Mann has been placed on administrative leave as of April 9th, pending an internal investigation."  Def.'s Mot. for Summ. J. Ex. 17.  The e-mail also discussed procedures for the employee-recipients to address issues that might arise during Mann's absence.

On June 11, 2008, Mann filed a complaint against Defendants, alleging one False Claims Act (FCA) violation for retaliation under 31 U.S.C. § 3730(h) and one state-law defamation claim.  On June 24, 2008, HKD informed Mann that he was under investigation for his conduct pertaining to an

unrelated sale of weapons to the Blue Lake Police Department. HKD suspended him without pay pending the outcome of its investigation.  On July 17, 2008, Newton notified Mann that, effective immediately, HKD had terminated his employment for cause.

On July 18, 2008, Mann filed an amended complaint (Amended Complaint) alleging additional violations of the FCA. Specifically, he alleged that Defendants retaliated against him, in violation of 31 U.S.C. § 3730(h), after Mann complained to his superiors about possible fraud on the government (Count I) and again after he filed this action based on those same complaints (Count II).  Mann also restated his prior defamation claim (Count III) and brought a second defamation claim based on another statement by one of Defendants' employees (Count IV).  He requested reinstatement or front pay, economic damages for lost wages and benefits, compensatory damages for emotional distress and loss of reputation, punitive damages, injunctive relief to prevent further harm to the public, and reasonable attorney's fees and costs.

Defendants filed a Motion to Dismiss the Amended Complaint on August 22, 2008.  The Court granted this motion with respect to Count II on October 7, 2008.  On October 21, Plaintiff moved to file a Second Amended Complaint that added new factual allegations to Count I.  The presiding magistrate judge granted

5

the motion on November 7, 2008.  On February 10, 2009, the Court granted a Joint Stipulation to dismiss Count IV with prejudice.

Defendants moved for summary judgment in their favor on Counts I and III on April 8, 2009.  Plaintiff opposed the motion and Defendants filed a reply.  This matter is currently before the Court.

## II.  Standard of Review

Summary judgment is appropriate only if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Evans v. Techs. Apps. & Serv. Co.*, 80 F.3d 954, 958-59 (4th Cir. 1996) (citations omitted). The party seeking summary judgment has the initial burden to show the absence of any dispute of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  Once a motion for summary judgment is properly made and supported, the opposing party bears the burden to show that a genuine dispute exists.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Anderson*, 477 U.S. at 248.  The party opposing summary judgment "must set forth specific facts showing

6

that there is a genuine issue for trial." *Id.* (quotation
omitted). A "mere scintilla" of evidence, *id.* at 248-52, or
unsupported speculation, *Ash v. United Parcel Serv., Inc.*, 800
F.2d 409, 411-12 (4th Cir. 1986), are insufficient to withstand a
motion for summary judgment. In reviewing the record on summary
judgment, "the court must draw any inferences in the light most
favorable to the non-movant." *Brock v. Entre Computer Ctrs.,
Inc.*, 933 F.2d 1253, 1259 (4th Cir. 1991) (citations omitted).

### III. Analysis

Defendants argue that the Court should grant summary
judgment in their favor on Count I because the alleged conduct
does not violate the FCA. They submit that Count III should be
similarly resolved in their favor because the allegedly
defamatory statement is not actionable and, in any event, is
protected by a qualified privilege. The Court will address the
merits of each argument in turn.

A.    Count I: Retaliation under 31 U.S.C. § 3730(h)

The FCA creates civil liability for "[a]ny person who
knowingly" presents, makes, or uses "a false or fraudulent claim
for payment or approval by the Government." 31 U.S.C.
§ 3729(a)(1)-(7). A claim under the FCA may be brought by the
government, or by an individual in a qui tam action. *Id.* at
§ 3730(h). In addition, § 3730 (Civil Actions for False Claims),

under which Plaintiff brings Count I, provides that:

> Any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole.

*Id.* at § 3730(h).

To prove that an employer retaliated against an employee in violation of 31 U.S.C. § 3730(h), the employee must "prove that (1) he took acts in furtherance of a qui tam suit [i.e. engaged in 'protected activity']; (2) his employer knew of these acts; and (3) his employer discharged him as a result of these acts." *Zahodnick v. Int'l Bus. Mach. Corp.*, 135 F.3d 911, 914 (4th Cir. 1997) (brackets in original).

> 1. *Proving a Violation of § 3729 is Not an Element of a § 3730(h) Action*

As a threshold matter, the Court recognizes that, to avoid summary judgment, Plaintiff need not show that Defendants made a false claim on the government in violation of a separate section of the FCA, 31 U.S.C. § 3729. As the Court previously acknowledged in its opinion granting in part and denying in part Defendants' motion to dismiss the Amended Complaint, "proving a violation of § 3729 is not an element of a § 3730(h) cause of action." *Graham County Soil & Water Conservation Dist. v. U.S.*

*ex rel. Wilson*, 545 U.S. 409, 416 n.1 (2005) (citations omitted). The FCA's anti-retaliation provision "protects an employee's conduct even if the target of an investigation or action to be filed was innocent." *Id.* at 416 (footnote omitted).

    2.   *Element 1: Plaintiff's Action in Furtherance of a qui tam suit*

Again, the first element of a FCA retaliation claim under 31 U.S.C. § 3730(h) requires a plaintiff to show that he took "lawful acts in furtherance of an action filed or to be filed under this section." Such conduct, referred to as "protected conduct," is shielded by the FCA and can include, not only filing a qui tam suit under the FCA, but also "investigation for, initiating of, testimony for, or assistance in" an FCA suit. *Id.*

In line with the Seventh, Ninth, Eleventh, and District of Columbia Circuits, the Fourth Circuit has held that an employee has engaged in protected activity "when litigation is a 'distinct possibility,' when the conduct 'reasonably could lead to a viable FCA action,' or when . . . litigation is a 'reasonable possibility.'" *Eberhardt v. Integrated Design & Constr., Inc.*, 167 F.3d 861, 869 (4th Cir. 1999) (citations omitted). "[A]n employee need not [] actually file[] a qui tam suit or even known about the protections of section 3730(h)" to qualify for protection under the retaliation provision. *Id.* at 867 (*citing U.S. ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731,

9

740 (D.C. Cir. 1998)).  Whether an employee has engaged in
"protected conduct" is a "fact-specific inquiry."  *Hutchins v.
Wilentz, Goldman & Spitzer*, 253 F.3d 176, 182 (3d Cir. 2001).

        a.   <u>Characterizing Employer's Activity as Illegal
            or Fraudulent</u>

      The Fourth Circuit has twice addressed the question of
whether a plaintiff's activities constitute "protected activity."
Both cases involved situations in which the plaintiffs complained
to their supervisors about errors made in billing the government.
In the first, the court found that the plaintiff had not engaged
in protected activity where he had merely informed his supervisor
that other employees were incorrectly charging time spent on one
project to another.  *Zahodnick v. Int'l Bus. Mach. Corp.*, 135
F.3d 911, 914 (4th Cir. 1997).  In the second, it found that
plaintiff had engaged in protected activity when he "not only
. . . characterized the [employer's] billings as illegal during
the course of the [internal] investigation, but also [] advised
[his supervisor] to obtain counsel both for [the corporation] and
for himself."  *Eberhardt*, 167 F.3d at 867-69.

      These cases show that an employee who specifically
"characteriz[es] the employer's conduct as illegal or fraudulent
or recommend[s] that legal counsel become involved" may be
engaging in protected activity.  *Id.* at 868.  One who simply
reports "mischarging" or investigates "the employer's
non-compliance with federal or state regulations" does not.  *Id.*

(*quoting Zahodnick*, 135 F.3d at 914; *Yesudian*, 153 F.3d at 740) (internal quotations and alterations omitted). Thus, in this Circuit, a court can determine whether protected activity may have occurred by looking to whether the plaintiff specifically alleged that the defendant's actions were illegal or fraudulent. The Court will evaluate Plaintiff's allegations for these types of statements at this time.

Nowhere in his opposition does Plaintiff clearly identify the conduct that he believes qualifies as protected activity. From its own reading of the evidence submitted, the Court finds that Plaintiff's allegedly protected activities regarding the HKD bid can be divided into three categories: (1) concerns Plaintiff relayed to other HKD employees about submitting a non-conforming rifle to the Secret Service in response to the RFP, (2) Plaintiff's objection to submitting HKD rifles with aftermarket ambi-levers, which did not meet HKD's quality standards, (3) Plaintiff's allegations, made both within and without HKD, that Weber had engaged in illegal conduct by giving the aftermarket ambi-levers to Officer Galvin after the RFP closed.[3]

---

[3] In the course of this litigation, Plaintiff focused on a statement in HKD's bid that an ambi-lever for the HKD rifle submitted with the bid was "currently in production and available, however it will not be available for the initial delivery date of the test weapons due to import timelines." Def.'s Mot. for Summ. J. Ex 7. Plaintiff submitted no evidence that he objected to this statement prior to the time that HKD allegedly retaliated against him. That he now believes it to be a false or fraudulent statement is not relevant to whether Defendant, in April 2008, retaliated against him for assisting in an FCA action filed or to be filed.

The Court finds that only the third category of conduct merits further review.  The only evidence before the Court showing that Plaintiff specifically characterized Defendant's conduct as "illegal" or "fraudulent" pertains to the third category of allegations - regarding Weber's instructions to give the aftermarket ambi-levers to Officer Galvin.  Pl.'s Mem. in Opp'n Ex. 51 at 185-86, 187-89 (Mann Depo.).  In his deposition, Plaintiff testified that he complained of Weber's conduct to a number of people inside and outside of HKD and, in doing so, referred to Weber's conduct as "illegal."  Pl.'s  Mem. in Opp'n Ex. 51 at 187, 189 (Mann Depo.).  Based on this testimony, the Court finds that a jury could conclude that Plaintiff alerted to purposeful fraud with respect to the submission of the ambi-levers, rather than mere accidental "mischarging," *Zahodnick*, 135 F.3d at 914; *Hutchins v. Wilentz, Goldman & Spitzer*, 253 F.3d 176, 191 (3d Cir. 2001).

It is clear, however, that the other complaints that Plaintiff raised were simply disagreements between himself and his superiors and colleagues regarding how best to pursue the government contract at issue.  Pl.'s Mem. in Opp'n Ex. 51 at 137 (Mann Depo.).  At the time, Plaintiff did not allege that the other two categories of actions - submitting a non-conforming rifle in response to an RFP or submitting a rifle with a aftermarket ambi-lever that did not meet HDK's usual quality standards - were illegal or fraudulent.  Pl.'s Mem. in Opp'n Ex.

51 at 137 (Mann Depo.).  He merely advocated for different courses of action, but eventually agreed that HKD should submit a non-compliant bid and a non-complaint rifle.  Pl.'s Mem. in Opp'n Ex. 51 at 137 (Mann Depo.).  Further, even if Plaintiff believed or asserted that Defendant's actions violated the terms of the RFP, *see* Pl.'s Mem. in Opp'n 8, or federal procurement regulations, *see* Pl.'s Mem. in Opp'n Ex. 51 at 198-200 (Mann Depo.), allegations pertaining to breaches of contract or violations of federal regulations are simply not "protected conduct" as a matter of FCA law.  *See U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 379 (4th Cir. 2008); *Eberhardt*, 167 F.3d at 869.

> b.   <u>Sufficient Connection between Plaintiff's Conduct and a False Claim</u>

Defendant, however, submits that even Plaintiff's specific allegation that the late submission of the aftermarket ambi-levers was illegal conduct is not protected conduct. According to Defendant, Weber's conduct could not have provided Plaintiff with a reasonable basis to believe that Defendant had made a false claim on the government.  Def.'s Mot. for Summ. J. 10.  Without such a reasonable basis, it argues, an FCA action was neither a "distinct" nor a "reasonable" possibility.  Def.'s Mot. for Summ. J. 10 (*quoting Eberhardt*, 167 F.3d at 867).

Defendant is correct that the employee's allegedly protected activity "must concern false or fraudulent claims" to

13

be covered by the FCA's retaliation section.  *Eberhardt*, 167 F.3d at 868 (internal quotations and citations omitted).  "[P]rotected activity must involve 'investigatory matters that reasonably could lead to a viable False Claims Act case.'"  *U.S. ex rel. Brooks v. Lockheed Martin Corp.*, 423 F. Supp. 2d 522, 530 (D. Md. 2006) (*quoting Yesudian*, 153 F.3d at 740).  Thus, the next question for the Court is whether there is a dispute as to whether Plaintiff's allegations were "sufficiently connected to exposing fraud or false claims against the federal government" that they "concern[ed] false or fraudulent claims."  *Hutchins v. Wilentz, Goldman & Spitzer*, 253 F.3d 176, 191 (3d Cir. 2001).

     *Eberhardt* and *Zahodnick* are less instructive to the Court in this inquiry into whether Plaintiff's conduct "concern[ed] false or fraudulent claims."  In both, the plaintiffs clearly complained about the defendant's billing conduct.  Neither addresses a plaintiff's complaints about Defendant's conduct *after it submitted a bid* for a contract, rather than about claims for payment that it made on the Government.

     The Fourth Circuit's qui tam cases, however, make it clear that intentional false statements in a bid submitted to the Government for consideration can, in some cases, "constitute[] false statements under the FCA."  *U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 377 (4th Cir. 2008) (referring

14

to defendant's alleged "low-balling" of cost estimates in a bid) (*citing Harrison I*, at 781-83, 791).  This precedent is consistent with *U.S. ex rel. Marcus v. Hess*, 317 U.S. 537 (1943), in which the Court held that the "taint" of fraud caused by defendants who knowingly participated in a collusive bidding process "entered into every" payment made under the contracts that eventually resulted from the bidding process.  *Id.* at 543. "The initial fraudulent action and every step thereafter taken, pressed ever to the ultimate goal - payment of government money to persons who had caused it to be defrauded."  *Id.* at 543-54. *See also U.S. ex rel. Bettis v. Odebrecht Contractors of Cal.*, 297 F. Supp. 2d 272, 279 (D.D.C. 2004) (*citing Harrison*, 176 F.3d at 787-88, *U.S. ex rel. Alexander v. Dyncorp, Inc.*, 924 F. Supp. 292, 298 (D.D.C. 1996), and *Schwedt*, 59 F.3d at 199 & n.1)).

The legislative history of the FCA also supports this result, as it states that "each and every claim submitted under a contract . . . which was originally obtained by means of false statements or other corrupt or fraudulent conduct . . . constitutes a false claim."  S. Rep. No. 99-345, at 9 (1986), U.S. Code Cong. & Admin. News 1986, pp. 5266, 5274 (*citing U.S. ex rel. Marcus v. Hess*, 317 U.S. 537 (1943)).

Based on the above, the Court finds that false or fraudulent statements made during the bidding process can be the basis of a qui tam action under the FCA.  The Court recognizes

15

that the bidding process is at least somewhat removed from the process of actually submitting a claim for payment on the Government.  What is relevant to Count I, however, is whether a fraudulent bid could ever lead to FCA liability for the submitter.  In this Circuit the answer is clearly, yes.

      c.    <u>Existing Formulations for Determining Whether a "Distinct Possibility of Litigation" Exists</u>

Because the Court has found that Plaintiff did allege that Defendant engaged in illegal or fraudulent activity by submitting the ambi-levers to Officer Galvin after the bidding process closed, and because fraud in the bidding process can lead to FCA liability, the Court must now address whether a reasonable jury could find that Plaintiff's conduct made litigation a "distinct possibility," a "reasonable possibility," or "reasonably could lead to a viable FCA action."  *Eberhardt v. Integrated Design & Constr., Inc.*, 167 F.3d 861, 869 (4th Cir. 1999) (internal quotations and citations omitted).

At the outset of its analysis, the Court finds it appropriate to note that the legislative history of the FCA indicates that the courts should interpret "[p]rotected activity . . . broadly."  S. Rep. No. 99-345, at 35 (1986), reprinted in 1986 U.S.C.C.A.N. 5266, 5300.  In addition, the Court must view all the evidence presented in the light most favorable to the plaintiff, the non-moving party.  *Brock v. Entre*

*Computer Ctrs., Inc.*, 933 F.2d 1253, 1259 (4th Cir. 1991) (citations omitted).

In attempting to explain their own "distinct possibility" standards, the D.C. Circuit and two district courts within the Eleventh Circuit have written analyses that are helpful here.  First, both the Middle District of Alabama and the Southern District of Georgia highlighted the essential inscrutability of the "distinct possibility" standard.  They note that it "'resolves few questions and raises more: A distinct possibility of what?  In whose eyes?  At what time?  And how 'distinct,' or presumably non-attenuated, must the 'possibility' be?  Probable?  Foreseeable?  Or something less likely?'"  *Mack v. Augusta-Richmond County, Ga.*, 365 F. Supp. 2d 1362, 1378-79 (S.D. Ga. 2005) (*quoting Mann v. Olsten Certified Healthcare Corp.*, 49 F. Supp. 2d 1307, 1313 (M.D. Ala. 1999)).

Applying this standard, these courts both concluded that the most important element in the "distinct possibility" analysis is "the purpose of the False Claims Act['s] . . . whistle blower protection, . . . assuring that an employer's motivation behind any action against an employee is not retaliatory."  *Mann*, 49 F. Supp. 2d at 1313-14; *see also Mack*, 365 F. Supp. 2d at 1378-79 (*quoting Mann*).  They resolved the issue of whether there was a possibility of litigation by looking at "[w]hether the employee engaged in conduct from which a

17

factfinder could reasonably conclude that the employer could have feared that the employee was contemplating filing a qui-tam action against it or reporting the employer to the government for fraud." *Mann*, 49 F. Supp. 2d at 1314; *see also Mack*, 365 F. Supp. 2d at 1379 (*quoting Mann*).  The perspective that these courts take, then, is that of the employer at the time of the retaliation.  This emphasis ties in with the requirements behind the second element of the FCA retaliation claim: the employer's knowledge that the employee engaged in protected activity and affords wide protection to whistleblowers, so long as their conduct raised a fear of a qui tam action with the employer.  The Court does not favor this interpretation, however, because it appears somewhat duplicative of the second element of an FCA retaliation action, discussed in section III.A.2, below, that requires the plaintiff to show the employer's knowledge of  his allegedly protected actions in furtherance of a qui tam action "filed or to be filed."  31 U.S.C. § 3730(h).

A different interpretation of the "distinct possibility" requirement, which Defendant urges the Court to apply, is employed by the Third Circuit.  It "require[s] that there at least be a distinct possibility that a viable FCA action could be filed." *Dookeran v. Mercy Hosp. of Pittsburgh*, 281 F.3d 105, 108 (3d Cir. 2002) (citations omitted).  In *Dookeran*, Plaintiff's retaliation claim failed because he did not

18

"demonstrate that the application that he refused to sign was a 'claim' within the meaning of 31 U.S.C. § 3729." 281 F.3d at 109.  The court found that the document in question was merely an application and, "[e]ven if the application had been accepted (which it was not), no money . . . would have been paid to the defendant.  [It] was simply the first step in a process that ultimately might have led, but in actuality did not lead, to the authorization of the payment of federal funds."  *Id.*

The Third Circuit's formulation thus appears to allow the Court to consider all of the information presented to it, not merely that available to either the employee or the employer at the time of the allegedly protected conduct.  *See id.* at 109 (noting that one reason plaintiff did not present a "distinct possibility of litigation" was that the Government denied the hospital's allegedly fraudulent application).  The employee must show the Court that his protected activity related to an actual (rather than potential) "claim" under 31 U.S.C. § 3729.  *Id.*  If the employee has insufficient evidence of the "claim," or was ultimately incorrect that there was a false claim, any resulting retaliation is not actionable under the FCA.

The Court disfavors the Third Circuit's formulation. It finds that it affords insufficient protection to employees who reasonably believe, based on the information available to them at the time, that their employer is filing fraudulent claims.  It

19

protects only employees whose allegation that the employer submitted a false claim is ultimately proven correct.  An employee has either two remedies, a qui tam action and a retaliation claim, or none.  Neither the Third Circuit nor Defendant has pointed to statutory language, legislative history, or other case law supporting this strict confluence between the application of two separate sections of the FCA.  Further, it appears inappropriate to apply the Third Circuit standard in this Circuit, which has recognized that a "claim," for the purposes of a qui tam action, can include pre-"claim" activity.  *See* Section III.A.2.b, above.

The D.C. Circuit has applied a different interpretation of the "distinct possibility of litigation" requirement.  *See U.S. ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 740-41 (D.C. Cir. 1998).  Its interpretation revolves around the question whether the plaintiff had a "good faith" belief, based on information he had "at the time of the retaliation," to make it "reasonable to conclude there was a 'distinct possibility' [the plaintiff] would find evidence" that the defendant had submitted false claims.  *Id.*  Under this theory, the ultimate existence of evidence implicating the defendant is irrelevant.  *Id.* ("The fact that Yesudian may have failed to find such evidence in the end means only that . . . he ultimately would not be entitled to recover on his [§ 3729] qui tam claim.").

The Court believes that the *Yesudian* interpretation of a "distinct possibility" best effects the purposes of the FCA. It ensures broader coverage for whistleblower actions than for direct FCA liability pursuant to a § 3729 qui tam action. Broader liability is consistent with the plain language of the FCA retaliation provision, which provides protection for all "lawful acts in furtherance of an [FCA] action," 31 U.S.C. § 3730(h), and the legislative history of this section, which advocates for a "broad" interpretation of "protected activity," S. Rep. No. 99-345, at 35 (1986), reprinted in 1986 U.S.C.C.A.N. 5266, 5300.  It is also consistent with the Supreme Court's generally solicitous attitude toward retaliation claims, *see, e.g.*, *Crawford v. Metro. Gov't of Nashville & Davidson County, Tenn.*, 555 U.S. --, 129 S. Ct. 846 (2009) (addressing a retaliation claim brought under Title VII of the Civil Rights Act of 1964), and *Graham County Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 545 U.S. 409, 416 n.1 (2005) (citations omitted), in which the Supreme Court clearly stated that proving a violation of 31 U.S.C. § 3729 is not an element of a § 3730(h) claim.

        d.   <u>Whether the Purportedly Illegal Activity that Plaintiff Complained of Created a "Distinct Possibility of Litigation"</u>

It is at this point that Plaintiff's FCA retaliation claim unravels.  The Court finds that Plaintiff's allegations to

various persons, both inside and outside of the HKD organization, regarding Weber's decision to provide aftermarket ambi-levers to Officer Galvin at night, in a parking lot, after the relevant bidding period had concluded, did not create a "distinct possibility" of a claim under the FCA.  The Court applies *Yesudian*, 153 F.3d 731, to reach this result, but finds that, its conclusion would be the same, and for similar reasons, under either of the other interpretations of a "distinct possibility of litigation."

First, it is undisputed that HKD did not make any statements to the Secret Service in its bid that Plaintiff identified as false or fraudulent at the time.[4]  It submitted a rifle that was non-conforming in a number of ways and that was clearly identified as such.  Def.'s Mot. for Summ. J. Ex. 7.  The submission of the ambi-levers to Officer Galvin was completed outside of the bidding process and the bidding time.  While it appears highly likely that Weber's conduct violates the RFP and the government's regulations on the bid process, it did not involve the presentation of "a false or fraudulent claim for payment or approval by the Government."  31 U.S.C. § 3729(a)(1)-(7).

---

[4] *See* Pl.'s Mem. in Opp'n Ex. 51 at 137 (Mann Depo.); Pl.'s Mem. in Opp'n Ex. 11 at 79-82 (Einwechter Depo.).  *See also* section III.A.2.a at n.3, above.

Further, it could not have *ever* involved the presentation of "a false or fraudulent claim for payment or approval by the Government." *Id.* The ambi-levers were submitted outside of the bid process. Even if the government had accepted HKD's woefully non-compliant bid as a contract, that contract would be one in accordance with the terms of HKD's bid: for rifles that were too tall, too heavy, too long, had the wrong trigger, a trigger pull with too much weight, and, of course, no ambi-levers. Def.'s Mot. for Summ. J. Ex. 10 (e-mail from Secret Service identifying the six reasons that HKD's bid failed).

If HKD's conduct, as alleged by Plaintiff, could result in FCA liability, then all manner of conduct, rather than that that bears some relation to the presentation of a false claim for payment to the Government, would subject government contractors to liability under the various provisions of the FCA. While the Court could debate the wisdom of greater liability for contractors, it is for Congress to establish the boundaries of FCA liability, not the judiciary. Thus, if the Court looks at whether Plaintiff's allegations, if true, would *actually* subject Defendant to liability a qui tam case under the FCA, to determine whether a distinct possibility of litigation exists, then it must find that there was no distinct possibility. *See Dookeran v. Mercy Hosp. of Pittsburgh*, 281 F.3d 105, 108 (3d Cir. 2002) (citations omitted); *Hutchins v. Wilentz, Goldman & Spitzer*, 253 F.3d 176, 182 (3d Cir. 2001).

Next, Plaintiff has not submitted any evidence showing that he believed that there were any false statements submitted with the bid.  Plaintiff agreed that HKD should submit a non-conforming bid, clearly identified as such, to the Secret Service.  Pl.'s Mem. in Opp'n Ex. 51 at 137 (Mann Depo.). Plaintiff also never accused Weber of submitting any false claims for payment on the government.  He complained that Weber's conduct was generally "illegal" and he thought, Pl.'s Mem. in Opp'n Ex. 51 at 188-89 (Mann Depo.), after conducting some research, that it might violate federal regulations, Pl.'s Mem. in Opp'n Ex. 51 at 190-91 (Mann Depo.).  Thus, if the Court looks at whether *Plaintiff* believed, at the time, that Defendant could be liable for false claims on the Government to determine whether a distinct possibility of litigation exists, then it must find that there was no distinct possibility.  *See U.S. ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 740-41 (D.C. Cir. 1998).

Finally, Defendant conducted an investigation of Mann's allegations and determined that Weber's actions did not subject it to FCA liability.  Pl.'s Mem. in Opp'n Ex. 11 at 79-82 (Einwechter Depo.).  Thus, if the Court were to look at whether *Defendant* believed, at the time, that there was a "distinct possibility of litigation" under the FCA, it must find that Plaintiff's conduct did not raise such a distinct possibility. *See  Mack v. Augusta-Richmond County, Ga.*, 365 F. Supp. 2d 1362,

24

1378-79 (S.D. Ga. 2005) (*quoting Mann v. Olsten Certified Healthcare Corp.*, 49 F. Supp. 2d 1307, 1313 (M.D. Ala. 1999)).

Because the Court finds Plaintiff's evidence to be sorely lacking in any connection to a false claim for payment or the FCA, the Court finds that, as a matter of law, Plaintiff did not engage in conduct that may be protected by the FCA's anti-retaliation provision.  The Court acknowledges that Plaintiff may feel that Defendant unfairly retaliated against him for his good-faith concerns about Weber's questionable conduct, but it is clear to the Court that whatever may have occurred between the parties, Plaintiff is simply not protected by the FCA, an Act which is aimed at a specific subset of conduct involving the government.

3.   *Element 2: Employer's Knowledge of Plaintiff's Actions in Furtherance*

Defendants do not argue that the Court should grant summary judgment in their favor because they did not have knowledge of Mann's "protected activities."  In their statement of undisputed facts, Defendants acknowledge their receipt of Mann's allegations.  *See* Defs.' Mot for Summ. J. ¶¶ 24-26.

4.   *Element 3: Employer's Retaliatory Acts*

Defendants do not argue that the Court should grant summary judgment in their favor because Plaintiff cannot show that his working environment changed after he made his complaints.  Mann has submitted evidence showing that he was

placed on administrative leave, his access to HKD e-mail was cut-off, he was not permitted in the office unescorted, he was ostracized in the office, his responsibilities were reduced, he was suspended, and ultimately, his employment was terminated. *See* Pl.'s Mem. in Opp'n at Ex. 51 (Mann Depo.).

In conclusion, for all the reasons discussed above, the Court finds that a reasonable jury could not conclude that Mann engaged in protected activity.  In spite of the volumes of documents that Plaintiff submitted to defend his FCA claim, he has failed to support his claim with sufficient evidence to allow this issue to go to a jury.  There is no genuine dispute of material fact regarding Plaintiff's allegedly protected conduct. The Court will grant Defendants' Motion for Summary Judgment on Count I.

B.   Count III: Common-Law Defamation Claim

In Virginia, common law defamation requires proof of (1) the publication of (2) a false and defamatory statement (3) made with the requisite intent*.  Chapin v. Knight Ridder, Inc.*, 993 F.2d 1087, 1092 (4th Cir. 1993) (citations omitted). That Weber sent the e-mail that is the subject of this claim and the specific contents of that e-mail are undisputed.  Thus, the Court must first address the question whether the statement at issue is capable of being false and defamatory as a matter of law.  *See Chaves v. Johnson*, 335 S.E.2d 97, 101 (Va. 1985).  If the Court finds that the statement is capable of being false and

defamatory, it must next address whether Plaintiff has presented sufficient evidence to allow a jury to determine that the statement was made with the necessary intent.  *Chapin*, 993 F.2d at 1093.

    1.   *False & Defamatory Statement*

      "Virginia law requires that the potential defamatory meaning of statements be considered in light of the plain and ordinary meaning of the words used in context as the community would naturally understand them."  *Id.* (*citing Old Dominion Branch No. 496 v. Austin*, 192 S.E.2d 737, 742 (Va. 1972), *rev'd on other grounds*, 418 U.S. 264 (1974)).  A defamatory charge may be made expressly or by "inference, implication or insinuation."  *Hatfill v. N.Y. Times Co.*, 416 F.3d 320, 331 (4th Cir. 2005) (*quoting Carwile*, 82 S.E.2d at 592).  Thus, the meaning of a defamatory statement may come, not only from the actual words used, but also from any "inferences fairly attributed to them."  *Wells v. Liddy*, 186 F.3d 505, 523 (4th Cir. 1999) (*quoting Yeagle v. Collegiate Times*, 497 S.E.2d 136, 138 (Va. 1998) (internal quotations and alteration omitted)).  A "plaintiff may not rely on minor or irrelevant inaccuracies," however, to state a claim.  *Jordan*, 612 S.E.2d at 206 (citation omitted).

      The disputed statement is contained in an e-mail from Weber to several of Defendant's employees and states: "You may or may not be aware of what occurred last week, but in the event

27

that you are not, here is a brief update.  Jason Mann has been placed on administrative leave as of April 9th, pending an internal investigation."  Def.'s Mot. for Summ. J. Ex 17.  These are the first two sentences of a four-paragraph e-mail that went on to discuss how the recipients were to address various issues "[i]n the interim."  Def.'s Mot. for Summ. J. Ex 17.  Weber identified three people as contacts for specific issues that might arise and concluded with request for a conference call to "give [the recipients] a bit more guidance in [Mann]'s absence."  Def.'s Mot. for Summ. J. Ex 17.

a.   <u>False Statement</u>

Defendant first argues that Court should grant summary judgment in its favor on this claim because the contents of the Weber e-mail are true.  It is undisputed that Mann *was* placed on administrative leave, beginning April 9, 2008, while an investigation inside HKD was pending.  Plaintiff, however, argues that the e-mail was false because it implied that Mann was the subject of the internal investigation.

"To be actionable, a statement must be a false statement of fact, not opinion."  *Jafari v. Old Dominion Transit Mgm't Co.*, 2008 WL 5102010 (E.D. Va. Nov. 28, 2008) (*citing Jordan v. Kollman*, 612 S.E.2d 205, 206-07 (Va. 2003)).  A statement is not false if its content or "imputation is 'substantially' true."  *Jordan*, 612 S.E.2d at 206 (*quoting*

28

*Saleeby v. Free Press, Inc.*, 91 S.E.2d 405, 407 (Va. 1956)
(internal quotations omitted)).

Viewing the evidence in the light most favorable to the
Plaintiff, the Court finds that the Weber e-mail, along with the
"inferences fairly attributable" thereto, could be fairly
determined to be a false statement.  Plaintiff submitted evidence
showing that the e-mail's recipients inferred from its contents
that Mann was the subject of the pending investigation.  Pl.'s
Mem. in Opp'n at 26-31 (*citing* Reidsma Decl., Cox Depo., Cabrera
Decl., Pierson Decl.).  Further, whether one is the subject of an
investigation or the instigator of the investigation is not a
"minor or irrelevant inaccurac[y]," but a key distinction in the
work place.

b.  *Defamatory Statement*

Defendant next argues that the Weber e-mail cannot be
defamatory as a matter of law.  It submits that the e-mail is
neutral in content and tone and does not fit into any of the four
categories of defamation per se.  Statements that are defamatory
per se[5] are those which (1) impute to a person a criminal offense
of moral turpitude for which the party may be indicted and
punished, (2) impute that a person is infected with some
contagious disease that would exclude the person from society,

---

[5] Plaintiff has alleged that the Weber e-mail was defamatory per se,
Compl. ¶¶ 111-113, the Court will thus only evaluate whether it meets the
requirements of defamation per se.

(3) impute an unfitness or lack of integrity required to perform official or professional duties, or (4) prejudice a person in his or her profession or trade. *Wells v. Liddy*, 186 F.3d 505, 522 (4th Cir. 1999) (*quoting Carwile v. Richmond Newspapers, Inc.*, 82 S.E.2d 588, 591 (Va. 1954)). "Merely offensive or unpleasant statements are not defamatory." *Id.* Neither are those statements in which the falsity of the statement and its "defamatory 'sting'" do not "coincide." *Id.*

As noted above, the Court must consider the defamatory nature of a statement both in light of its express meaning and the "inference, implication or insinuation" that it creates. In section III.B.1, above, the Court found that the Weber e-mail implied a false statement of fact, namely that Mann was the party under investigation. Plaintiff now argues that the Weber e-mail implies that Mann was under investigation specifically for defrauding the government. Pl.'s Mem. in Opp'n 31. Based on this reading of the e-mail, Plaintiff submits, Weber's statement makes allegations of criminal activity, moral turpitude, and an unfitness for his career in law enforcement sales, all types of defamation per se. Pl.'s Mem. in Opp'n 31-32.

It is important to note that mere allegations of unsatisfactory job performance do not generally rise to the level of defamation per se. *McBride v. City of Roanoke Redevelopment & Housing*, 871 F. Supp. 885, 892 (W.D. Va. 1994); *Echtenkamp v. Loudon County Pub. Schs.*, 263 F. Supp. 2d 1042, 1063 (E.D. Va.

30

2003).  Thus, without the proposed inferences - that Mann was the
subject of the internal investigation and that the investigation
concerned Mann's alleged attempts to defraud the government - the
Weber e-mail cannot be the basis of a defamation claim.

        The Court finds that Plaintiff's proposed
interpretation stretches the "natural meaning" of Weber's
statement too far.  Plaintiff argues that the e-mail can be
defamatory as a matter of law, but acknowledges that it can only
be so if the jury piles one inference upon the other.  It has
submitted evidence to support the first assertion, that the
statement falsely implied that Plaintiff was the subject of the
investigation.  *See* Section III.B.1.a, above.  It has not
submitted any evidence supporting the second inference, that the
e-mail implied Mann was under investigation specifically for
defrauding the government.  Further, there is nothing in the
objected-to sentences that provides a basis for the second
implication that Plaintiff advocates.  The Weber e-mail contains
no mention of the subject of the investigation or the reason for
the investigation.  It did not mention fraud, misrepresentations,
or government contracts.  It is neutrally-worded, setting forth
the fact of Mann's absence in sixteen words.  The e-mail then
immediately moves on, discussing how the recipients were to
handle the absence.  The Court finds, in the absence of any
evidence to the contrary, that Plaintiff's line of inferences is

unjustified and the Weber e-mail is not defamatory per se as a matter of law.

### 3.   *Qualified Privilege*

In Virginia, a communication between persons within a corporate entity who have a duty and interest in the subject matter triggers a qualified privilege unless Plaintiff shows by clear and convincing evidence that the communication was made with malice.  *Larimore v. Blaylock*, 528 S.E.2d 119, 121-23 (Va. 2000).  Malice exists if the speaker knows that the statement is false or makes the statement with a reckless disregard of whether or not it is false.  *Great Coastal Exp., Inc. v. Ellington*, 334 S.E.2d 846, 851 n.3 (Va. 1985) (*citing N.Y. Times v. Sullivan*, 376 U.S. 254, 280 (1964)).  It may also exist when the communication is made with a sinister or corrupt motive, such as hatred, revenge, personal spite, ill will, or desire to injure the plaintiff.  *Id.* (*quoting Preston v. Land*, 255 S.E.2d 509, 511 (Va. 1979)).

Defendant argues that, if the Court finds that the Weber e-mail can be both false and defamatory per se, the claim Plaintiff brings in Count III must still fail because it is subject to a qualified privilege because it was an intra-corporate communication.  Plaintiff disagrees, arguing that this e-mail was unnecessary for the corporation and it has submitted sufficient evidence of malice to negate any qualified immunity. The Court has found that the Weber e-mail was not defamatory per

se, however, it also finds that Count III cannot proceed because the e-mail is protected by a qualified privilege.

The e-mail was sent to six of Mann's subordinates and colleagues.  These are persons with a duty or interest in Mann's absence from work.  Further, the e-mail served a corporate purpose: to inform the recipients that Mann was absent and would continue to be so, and to instruct them how to handle issues that might arise, in Mann's absence.  "'Public policy and the interest of society demand that . . . an employer, or his proper representatives,'" be able to freely conduct conversations such as that in this case, to inform employees about the absence of another and how to business should be continued in light of that absence.  *Larimore*, 528 S.E.2d at 121 (*quoting Chesapeake Ferry Co. v. Hudgins*, 156 S.E. 429, 441 (Va. 1931)).

Finally, Plaintiff has not submitted sufficient evidence of malice to overcome Virginia's presumption against it. He has submitted general evidence showing that Weber "seemed angry"[6] about Plaintiff's allegations relating to HKD's bid, but none of that evidence relates to Weber's intent in sending the specific e-mail that is the subject of Plaintiff's claim.  Given

---

[6] Plaintiff has submitted evidence that (1) Weber knew that HKD was investigating his conduct, (2) Reidsma thought that Weber "seemed angry" when he read witness statements regarding the aftermarket ambi-levers, (3) Weber admitted that Mann's allegations upset him, (4) Weber attempted to "cover-up" the conduct for which he was being investigated, and (5) Aliveto "had the impression" that Weber's response to Mann's allegations was to try to terminate Mann.  Pl.'s Mem. in Opp'n at 34-35 (citations omitted).  Even were the Court to presume that the evidence Plaintiff cites actually supports these five assertions, which is highly debatable, none of them relate to Weber's decision to write and send the specific e-mail at issue.

the presumption against malice, the lack of any malice evident from the face of the Weber e-mail, and the lack of any evidence showing that Weber sent this communication maliciously, the Court finds that Plaintiff's defamation claim also fails as a matter of law because it is protected by a qualified privilege.  The Court will grant Defendant's motion for summary judgment on Count III.

### IV.   Conclusion

For these reasons, the Court will grant Defendants' motion for summary judgment.

An appropriate Order will issue.

July 1, 2009
Alexandria, Virginia

/s/
_____
James C. Cacheris
UNITED STATES DISTRICT COURT JUDGE
